# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **TRACY WALENCIEJ,** | : |
| | : |
| **Plaintiff,** | : |
| | : Case No. 2:22-cv-3199 |
| | : |
| v. | : |
| | : Chief Judge Algenon L. Marbley |
| **EASTERN OHIO CORRECTION** | : |
| **CENTER,** | : Magistrate Judge Elizabeth Preston Deavers |
| | : |
| **Defendant.** | : |
| | : |

## OPINION & ORDER

This matter is before this Court on Defendant Eastern Ohio Correction Center's Motion for Summary Judgment. (ECF No. 25). For the reasons that follow, the Motion is **GRANTED**.

## I. BACKGROUND

Plaintiff, Tracy Walenciej, alleges that her former employer, Defendant Eastern Ohio Correction Center, violated Title VII, 42 U.S.C. §§ 2000e *et seq.*, and Ohio's analogous provision, Ohio Rev. Code § 4112.02, when it fired her in 2020.[1] Eastern Ohio Correction Center ("EOCC") is a Community-Based Correctional Facility, which provides residential prison diversion for felony offenders in Ohio. (ECF No. 1 ¶ 10). EOCC's operations are overseen by a Facility Governing Board and Judicial Advisory Board, Ohio Rev. Code. § 2301.51(A)(8), while the day-to-day management of the facility is managed by an Executive Director, who is to "control, manage, operate, and have general charge of the facility." Ohio Rev. Code § 2301.55(A)(1). During the relevant period, the Executive Director of EOCC was Eugene Gallo. (ECF No. 1 ¶14).

---

[1] In her complaint, Plaintiff also refers a "severe and/or pervasive hostile work environment based on sex" and gendered disparities in pay at EOCC, (ECF No. 1 ¶¶ 1, 55), but she chose to omit these arguments from her response to Defendant's Motion, thereby abandoning any such claims.

1

Plaintiff was, at the time of her firing, Deputy Director. (*Id.* at ¶ 17). As Deputy Director, she was charged with "assist[ing] the facility's Executive Director in managing, operating, and maintaining the [EOCC] in a safe, and secure manner." (ECF No. 24-3 at 1). Ms. Walenciej served as Deputy Director from 2014 until her termination in 2020, and during that time, she was rated as "Exceptional" or "Advanced" in her performance evaluations. (ECF No. 32-9).

When Mr. Gallo began contemplating retirement in 2019, he recommended Ms. Walenciej as his replacement, and the Facility Governing Board "decided and voted that [she] would be the next executive director." (ECF No. 32-2 at 5). As those in the EOCC's orbit heard of the planned succession, the Facility Governing Board received nine complaints about Ms. Walenciej and other perceived management issues at EOCC, many of which were anonymous but a few of which were signed by former employees. (ECF No. 24-6). Because of the complaints, the Facility Governing Board voted to advertise publicly for the Executive Director position and open an investigation into Ms. Walenciej, during which Ms. Walenciej was placed on administrative leave. (ECF No. 32-12). The law firm representing Defendant in this case conducted the investigation. (ECF No. 24-5 at 1).

The investigation report focused on four complained-of categories of conduct: (1) whether Ms. Walenciej engaged in "bullying, harassing, and unprofessional behavior"; (2) whether Ms. Walenciej hired and gave "preferential treatment" to her friends; (3) whether Ms. Walenciej engaged in a romantic relationship with a subordinate, to whom she also gave preferential treatment; and (4) whether Ms. Walenciej operated the Vivitrol[2] program at the facility unethically, including the receipt of "kickback" gifts. (ECF No. 24-5 at 2). The thirty-page report concluded that each category of allegations against Ms. Walenciej could be substantiated, at least in part.

---

[2] Vivitrol is a drug-addiction treatment that is injected. (ECF No. 32-2).

2

(*See id.*).

With respect to language and bullying behavior in the workplace, Ms. Walenciej admitted that she "curses in the workplace every day." (*Id.* at 4). But she maintains that the use of such language was "pervasive" at EOCC. (*Id.*). Cursing aside, the report highlighted examples of behavior it described as unprofessional, several of which Ms. Walenciej admitted to: telling colleagues that she would "punch [them] in the throat" or "punch [them] in the dick;" calling one colleague "Hispanic" names like "Cheech;" writing the phrase "punch her in the cooter," a quote from a viral YouTube video, on a desk calendar; and maintaining a "shitlist" in her office, with employees' names on it. (*Id.*). Ms. Walenciej characterizes many of these as jokes that were generally in alignment with EOCC's workplace culture. (*Id.*). For example, Ms. Walenciej explains that several male employees would refer to her by "cupping their hands around their chest to mimic breasts." (ECF No. 33 at 12). Others made jokes about and gossiped about Ms. Walenciej being "under Frank's desk," which was to suggest that she and Frank were engaging in sexual activity at work. (*Id.* at 12-13). When Ms. Walenciej complained about these incidents, other employees were, at most, verbally reprimanded. (ECF No. 32-2 at 24). Plaintiff also alleges that several male staff members, including Mr. Gallo, would gather at the facility during work hours to participate in an informal gathering referred to as the "He-Man Woman Hater's Club." (*Id.* at 26).

The investigation also addressed whether Ms. Walenciej hired her friends and gave them preferential treatment. It concluded that, at times, outside candidates were selected to fill positions, even though postings had not been made available internally, in contravention of facility policy. (ECF No. 24-5 at 11). The report concluded that Ms. Walenciej did not, however, treat her friends more favorably with respect to compensation. (*Id.*).

3

Turning to Ms. Walenciej's inappropriate relationship with a subordinate, the report concluded that she engaged in a romantic and/or sexual relationship with Matt Grimard, an individual in her direct chain of command, for approximately one year. (*Id.* at 12). The relationship was undisclosed until Ms. Walenciej was under consideration for the Executive Director position. (*Id.*). At that time, Ms. Walenciej disclosed the relationship to the Executive Director, Mr. Gallo, who nonetheless recommended her to replace him. (ECF No. 32-2 at 19). Ms. Walenciej supervised Mr. Grimard's master's degree internship while the two were engaged in a sexual relationship and permitted Mr. Grimard to work on other aspects of his master's degree while on EOCC time. (ECF No. 24-5 at 16). She also permitted Mr. Grimard to use the EOCC van to transport himself to and from work when his car was being repaired, but she explains that this was a common practice at EOCC to ensure that employees could make their shifts. (*Id.*; ECF No. 32-2 at 18). Meanwhile, many staff members at the EOCC noticed that Mr. Grimard was excessively tardy and absent. (ECF No. 24-5 at 12). Mr. Grimard created management challenges for his direct supervisor, who expressed to other employees that she felt she could not escalate the issue to Ms. Walenciej. (*Id.* at 15). On one occasion, Mr. Grimard reportedly yelled at his supervisor, and on another, at Ms. Walenciej. (*Id.*). Mr. Grimard was not disciplined for this, or any other, behavior until he was terminated at the conclusion of the investigation. (*Id.*). The report concluded that Ms. Walenciej violated EOCC policies because her objectivity was impaired by her relationship with Mr. Grimard, and because the relationship negatively impacted the workplace. (*Id.* at 17).

The report also focused on the Vivitrol program that Ms. Walenciej instituted at EOCC. Both residents and non-residents received Vivitrol at the facility as an alternative to other substance abuse treatments like Methadone or Suboxone. Ms. Walenciej engaged Advanced

4

Nurse Practitioner Frank Vostatek to administer the program, but the EOCC had no written agreement for services with Mr. Vostatek, nor could staff identify a physician under which Mr. Vostatek was practicing. (ECF No. 24-5 at 17-20). Even though the Ohio Revised Code § 2301.58 and internal EOCC policies required that funds from the Resident Commissary Account be used "for the benefit of residents," Ms. Walenciej repeatedly used such funds for non-residents, including for referrals from Mr. Vostatek. (*Id.* at 17-18). Mr. Gallo, however, did approve those disbursements. (*Id.* at 23). Finally, the report explained that several staff members received gifts at Christmastime from Mr. Vostatek, including a bottle of vodka and an incense burner. (*Id.* at 19). Ms. Walenciej was unique in that she received a 50-inch television from Mr. Vostatek, although she explains that when she mentioned that she did not have a television, Mr. Vostatek suggested that she could go retrieve it from the dumpster outside a building that he was emptying. (ECF No. 32-2 at 13). Because EOCC policy prohibits employees from receiving unlawful inducements or using "their official position to secure privileges or advantages," the report concluded that the individuals who received gifts, including Mr. Gallo, violated facility policy. (ECF No. 24-5 at 26).

The report concluded that Ms. Walenciej engaged in several instances of misconduct, some of which were serious. In the report authors' views, "when viewed collectively, all acts of misconduct support the recommendation of termination." (*Id.* at 27). The report also recommended that Mr. Grimard be terminated, while recommending less severe discipline for other staff members. (*Id.* at 27-28). Finally, with respect to Mr. Gallo, the report's authors recommended the following:

> As Executive Director, Mr. Gallo should have been more aware/involved in the programs at the EOCC, especially those regarding the provision of medical care and/or involving the costs of the Vivitrol Program. Mr. Gallo was also aware that there was no contract for Frank Vostatek and received gifts from him. Mr. Gallo

5

> delegated the Vivitrol Program to his Deputy Director, Ms. Walenciej. Nevertheless, Mr. Gallo, as Executive Director, should have been more involved. It is understood that Mr. Gallo is planning on retiring at the end of 2020. However, it is suggested that the Governing Board hasten its hiring process and begin the transition to a new Executive Director as soon as practicable.

(*Id.* at 29). Ms. Walenciej was terminated through a letter from Mr. Gallo, although in interrogatory responses, Defendant identified "the Eastern Ohio Correction Center" as the "individual or individuals" who decided to terminate her employment. (ECF No. 32-35 at 7). Ms. Walenciej requested a formal public hearing one day prior to her termination, but EOCC's counsel denied her request, arguing that since Ms. Walenciej is an at-will employee, she was not entitled to any such hearing. (ECF No. 24-11). It instead construed her request as an appeal of her termination to Mr. Gallo, which was provided for under EOCC policy. Ms. Walenciej, however, declined to attend the appeal hearing. (ECF No. 24-13). In contrast, Mr. Gallo was permitted to retire on the same timeline already planned and now serves on the EOCC's Facility Governing Board. (ECF No. 32-2 at 37).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact[,] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716-17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the non-moving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249-50.

6

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (finding that after the burden shifts, the non-movant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

### III.  LAW AND ANALYSIS

Title VII provides, in pertinent part, that:

> It shall be an unlawful employment practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .

42 U.S.C. § 2000e-2(a).  Ohio Rev. Code § 4112.02(A) provides that:

> it shall be an unlawful discriminatory practice for any employer, because of the . . . sex . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Courts apply the familiar *McDonnell Douglas* burden-shifting framework to cases arising under Title VII.  411 U.S. 792, 802 (1973).  And "the elements and legal standards for establishing

7

unlawful sex discrimination are the same under Ohio Rev. Code § 4112.02 and under 42. U.S.C. §200e-2," such that the two can be analyzed together. *Laderach v. U-Haul of Nortwestern Ohio*, 207 F.3d 825, 828 (6th Cir. 2020). Under *McDonnell Douglas*, "the plaintiff bears the initial 'not onerous' burden of establishing a prima facie case of discrimination by preponderance of the evidence." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Should the plaintiff establish such a prima facie case, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant succeeds, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* at 391-92. Ultimately, though, "burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 392.

**A. Prima facie case**

A plaintiff may satisfy the burden of establishing a prima facie case of discrimination by presenting direct evidence of discriminatory actions. Direct evidence is "evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employee's action." *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008). Ms. Walenciej does not seek to establish a prima facie case through direct evidence.

A party can also prove discrimination through circumstantial evidence, in which case, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the position; and (4) that a similarly situated employee outside the protected class or classes was treated more favorably. *McDonnell Douglas*, 411 U.S. at 802. Here, the Parties agree that Ms. Walenciej satisfied the first three elements of the prima facie case but disagree with respect to whether she and any male employees

8

were similarly situated.  Ms. Walenciej identifies Mr. Gallo, the EOCC's Executive Director, as a potential comparator.  (ECF No. 33 at 28).  With respect to Ms. Walenciej and Mr. Gallo's job responsibilities, Defendant argues that Mr. Gallo cannot serve as a comparator because he had a different position and a different supervisor.  (ECF No. 25 at 18).

In *Mitchell v. Toledo Hospital*, the Sixth Circuit held that to be "deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  964 F.2d 577, 583 (6th Cir. 1992).  Since then, however, the Sixth Circuit has retreated from such a strict interpretation of similarity, holding that a plaintiff need not have a role identical to the employee receiving more favorable treatment, but only that the employees are similarly situated in all *relevant* aspects.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (finding that three, older, human resources employees' positions were similarly situated, even though they had different job responsibilities).  Indeed, the Sixth Circuit has criticized district courts for "applying an exceedingly narrow reading of the *Mitchell* decision," and for assuming that all the factors mentioned in *Mitchell* will be relevant in all circumstances.  *Ercegovich*, 154 F.3d at 352; *see also Jackson v. FedEx Corporate Services*, Inc. 518 F.3d 388, 394 (6th Cir. 2008) (noting the court's earlier disapproval of "a rigid standard of similarly situated that only took account of job functions").  The Sixth Circuit has made clear that the "'same supervisor' criterion is not an inflexible requirement." *McFadden v. City of Columbus*, No. 2:18-cv-544, 2021 WL 3510316, at *8 (S.D. Ohio, Aug. 10, 2021) (quoting *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479-80 (6th Cir. 2003) (cleaned up).

The need for flexibility in application of the similarly situated standard is particularly acute

9

when the employee in question has a unique role, such that application of a rigid standard would preclude the employee from the protections of Title VII. *See Ercegovich*, 154 F.3d at 353; *Jackson*, 518 F.3d at 394. This is precisely the sort of situation where demanding a precise analog for Plaintiff's job responsibilities as Deputy Director of EOCC would "effectively remove[]" her "from the protective reach of the antidiscrimination laws." *Jackson*, 518 F.3d at 397. There is only one Deputy Director of the facility at a time. And Plaintiff's job description made clear that the Deputy Director and Executive Director share many responsibilities: Ms. Walenciej's primary task was to assist Mr. Gallo in the performance of his duties as Executive Director. (ECF No. 24-3 at 1).

The Sixth Circuit has also clarified that in lieu of considering whether two employees have the same supervisor, it may be "more appropriate" to consider whether they "dealt with the same ultimate decision-maker." *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). It is not clear from the record whether Ms. Walenciej and Mr. Gallo shared an ultimate decision-maker with respect to discipline for the conduct discussed above. Presumably, it was the Facility Governing Board, not Mr. Gallo, who made the decision that Mr. Gallo would retain his employment despite his oversight failures. And although Ms. Walenciej's termination letter was signed by Mr. Gallo, Defendant identified only itself—EOCC—as the "individual or individuals" who decided to terminate Ms. Walenciej. (ECF No. 32-35 at 7). This interrogatory response suggests that perhaps the Facility Governing Board, as opposed to Mr. Gallo personally, was the ultimate-decision maker with respect to Ms. Walenciej's discipline.

Of more import, however, is whether Mr. Gallo and Ms. Walenciej were similarly situated with respect to the seriousness of their conduct. Conduct need not be identical, but courts look to the "comparable seriousness" of a comparator's actions. *Jackson v. VHS Detroit Receiving Hosp.*,

10

Inc., 814 F.3d 769, 778 (6th Cir. 2016). The Parties identify four general categories of conduct at issue: (1) mismanagement of the Vivitrol program; (2) the improper receipt of gifts from the pharmacist who administered the Vivitrol program; (3) inappropriate language and treatment of coworkers; and (4) Ms. Walenciej's admitted affair with one of her subordinates. Defendant argues that even though the external investigation concluded that Mr. Gallo did engage in some impropriety, Ms. Walenciej's was more serious in several respects. First, Defendant insists that even though Mr. Gallo was Executive Director, ultimate responsibility for the Vivitrol program's shortcomings rests with Ms. Walenciej. (ECF No. 25 at 3). Second, while Mr. Gallo and Ms. Walenciej both received bottles of Grey Goose vodka and incense burners from the Vivitrol contractor, only Ms. Walenciej retrieved a 50-inch television that the contractor was otherwise planning to discard. (*Id.*). Third, while Plaintiff contends that inappropriate language was commonly used in the workplace, including by Mr. Gallo, Defendant maintains that Plaintiff's conduct was uniquely troubling. (*Id.* at 10, 15, 19). Finally, and most importantly, Mr. Gallo did not engage in a romantic relationship with any of his subordinates; Ms. Walenciej admits that she did. (*Id.* at 5, 19).

Even putting aside purported differences in Ms. Walenciej's and Mr. Gallo's conduct with respect to the Vivitrol program, the receipt of gifts, and the use of coarse language, Ms. Walenciej engaged in a romantic relationship with her subordinate that outside investigators determined negatively affected the workplace and compromised her objectivity. That Mr. Gallo engaged in no such relationship is a material difference in the severity and quality of their misconduct. An "employer's more severe treatment of more egregious circumstances simply cannot give rise to an inference which would support the establishment of a prima facie case of discrimination." *Clayton*

*v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir. 2002).

Ms. Walenciej's arguments that the relationship with Mr. Grimard does not preclude Mr. Gallo from serving as a comparator are unavailing. (*See* ECF No. 33 at 34-35). That Defendant failed to point specifically to the relationship as cause for the termination in its interrogatory responses, instead indicating that all the conduct in the investigative report formed the basis for termination, is a distinction without a difference. (*Id.* at 34). Nor is it pertinent that the EOCC presented no evidence that the Facility Governing Board all agreed that the relationship warranted termination, or that Mr. Gallo indicated his support of Ms. Walenciej to her via text message once the investigation was underway. (*Id.* at 34). Finally, Ms. Walenciej points out that there is no explicit policy prohibiting relationships between employees, and that the policy that the report determined she violated—"act[ing] in any manner in which [the employee has] a personal interest which would impair their objectivity"—was impermissibly vague. (*Id.* at 34-35). But a romantic relationship between a subordinate and a superior is such a common example of impermissibly impaired objectivity that it is a cultural cliché. This is a situation in which any reasonable supervisor would understand that their conduct was in contravention of facility policy.

Unfortunately for Ms. Walenciej, the affair with Mr. Grimard looms large over the comparator inquiry in this case, and her attempts to minimize the role it played in her termination are not persuasive. Even though the similarity inquiry is the sort that can be left to the jury, *see e.g., Hisel v. City of Clarksville*, 2007 WL 2822098, at *6 (M.D. Tenn. Sept. 26, 2007), no reasonable jury could conclude on these facts that Ms. Walenciej and Mr. Gallo engaged in comparably serious misconduct, such that Ms. Walenciej has made out a prima facie case of sex

discrimination in violation of Title VII or Ohio Rev. Code § 4112.02.

### B. Nondiscriminatory justification

Having concluded that Ms. Walenciej has failed to establish a prima facie case of discrimination, this Court need not reach the remaining steps in the *McDonnell Douglas* burden shifting analysis. Assuming *arguendo*, however, that she had mounted a prima facie case, this Court will consider whether Defendant proffers a legitimate, nondiscriminatory reason for its actions, such that the burden would shift back to Ms. Walenciej. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Here, the same conduct discussed as part of the "similarly situated" inquiry forms EOCC's nondiscriminatory justification for firing Ms. Walenciej. In the EOCC's view, Ms. Walenciej was fired for a series of serious violations of the facility's policies, including mismanagement of the Vivitrol program, accepting impermissible gifts from contractors, and engaging in a romantic relationship with a subordinate, which impaired her judgment and created friction in the workplace.

### C. Evidence of pretext

Assuming Defendant would have met its burden of presenting a nondiscriminatory justification, the burden would shift back to the plaintiff to demonstrate pretext, that is, that the employer's reasoning was "fabricated to conceal an illegal motive." *Id.* A plaintiff demonstrates pretext where defendant's nondiscriminatory reason for defendant's action: "(1) had no basis in fact, (2) did not actually motivate defendant's conduct, or (3) was insufficient to warrant the challenged conduct." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 258 (6th Cir. 2002).

Ms. Walenciej focuses on the third prong, which "ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's

13

discharge." *Brahmbhatt v. Gen. Prod. Corp.*, No. 12-cv-919, 2014 WL 2711839, at *9 (S.D. Ohio June 16, 2014), *report and recommendation adopted*, 2014 WL 3404655 (S.D. Ohio July 10, 2014). Because Mr. Gallo did not engage in conduct that was substantially similar to Ms. Walenciej's, EOCC's decision to retain him cannot support a pretext showing.

But the Sixth Circuit has cautioned courts not to "lose the forest for trees" when considering pretext. *Chen*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). At this stage, "the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id.* To this end, Ms. Walenciej argues that "evidence of pretext may be found in the EOCC's disregard of its disciplinary policies and procedures" and Ohio Rev. Code § 121.22(G)(1). (ECF No. 33 at 37). Specifically, she contends that she was entitled to a public hearing in front of the EOCC.

Ohio Rev. Code § 121.22(G)(1) enumerates exceptions to the general requirement that public officials "take official action and [] conduct all deliberations upon official business only in open meetings." One such exception is that a public body, such as the Facility Governing Board, can vote to hold an executive session "for the sole purpose of" considering "the appointment employment, dismissal, discipline, promotion, demotion, or compensation of a public employee or official, or the investigation of charges or complaints against a public employee, official, licensee, or regulated individual, *unless the public employee, official, licensee, or regulated individual requests a public hearing.*" § 121.22(G)(1) (emphasis added).

Ms. Walenciej contends that the above-emphasized language indicates that her request for a public hearing ought to have been indulged. Defendant, however, argues that the statute only creates a right to a public hearing *before* termination has occurred. To support its point, Defendant asserts that Ms. Walenciej was terminated by the Facility Governing Board and Judicial Advisory

14

Board on April 8, 2024, before she requested the public hearing on April 9, 2024. (ECF No. 36 at 8-9). Defendant's contention that it fired Ms. Walenciej on April 8, 2024, however, is belied by a letter in the record from Defendant's counsel to Ms. Walenciej's counsel, in which defense counsel rejected Ms. Walenciej's request for a hearing, construed it as a request for an appeal, and mentioned that "Ms. Walenciej was not terminated until April 10, 2020." (ECF No. 32-24). Mr. Gallo also dated his letter terminating Ms. Walenciej "April 10, 2024." (ECF No. 24-8). Even if inadvertent, Defendant's argument is predicated on a concerning mischaracterization of the record.

Because this Court only reaches the issue of pretext *arguendo*, and does so on arguments that appear to rely on a mischaracterization of the timeline around Ms. Walenciej's firing, it need not resolve whether § 121.22(G)(1) required a public hearing here. Moreover, absent more, this Court doubts that a reasonable jury could conclude that a failure to follow § 121.22(G)(1) alone raises an inference of discrimination.[3] *See White v. Cols. Metro Housing Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) (explaining that an employer's failure to follow its own policies cannot alone indicate pretext).

Turning to Defendant's internal policies, EOCC's policy document provides that "termination or demotion is permitted only for good cause and, if requested, subsequent to a formal hearing on specific charges." (ECF No. 24-10 at 92-95). Defendant clarifies, however, that no policy requires a hearing before the Governing Board, as opposed to the Executive Director. (ECF

---

[3] It is worth noting, although Plaintiff does not make this argument, that "evidence of a discriminatory atmosphere . . . does tend to add 'color' to the employer's decisionmaking processes" and can help establish pretext. *Ercegovich* 154 F.3d at 356. Some of the disturbing instances that Ms. Walenciej describes—being referred to by imitations of her breasts, senior male staff participating in something known as a "He-Man Woman-Haters Club," and the like—are evidence of a discriminatory atmosphere. Although such evidence is stronger when it is spoken by the ultimate decision-maker, "comments of a nondecisionmaker are not categorically excludable." *Id.* Were this Court to have reached the issue of pretext, such evidence of discriminatory culture would have been relevant.

15

No. 36 at 9). EOCC did indeed offer Ms. Walenciej an opportunity to appeal her termination to Mr. Gallo at a hearing, but neither she nor her counsel attended. (ECF No. 24-13).

## IV. CONCLUSION

For the foregoing reasons, Defendant EOCC's Motion for Summary Judgment is **GRANTED**. (ECF No. 25). This case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:** May 30, 2024